UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONNECTICUT COMMUNITY BANK, | : | |
| NATIONAL ASSOCIATION, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:06-cv-1293 (VLB) |
| THE BANK OF GREENWICH, | : | |
| Defendant. | : | September 5, 2008 |

MEMORANDUM OF DECISION AND ORDER

This matter was tried before the court from February 11, 2008, through

February 19, 2008.  The plaintiff, Connecticut Community Bank, N.A. ("CCB"),

brings this action against the defendant, The Bank of Greenwich ("BOG"),

alleging trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1051

et seq., and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-

110(b) ("CUTPA").  For the reasons stated below the court renders judgment for

the CCB.

CCB brings this action on behalf of its oldest division, The Greenwich Bank

& Trust Company ("GBT"), to protect its two service marks, "The Greenwich Bank

& Trust Company" and "Greenwich Bank & Trust" (the "GBT marks"), from

infringement by BOG's service mark "The Bank of Greenwich."  It asserts claims

for trademark infringement and unfair competition and false designation of origin

pursuant to the Lanham Act, 15 U.S.C. §§ 1141(1)(a) and 1125(a) respectively, and

unfair methods of competition and unfair or deceptive acts in commerce

1

pursuant to CUTPA, Conn. Gen. Stat. § 42-110(b). Both GBT and BOG operate local banks in exclusively within the town of Greenwich, CT.

As the court explained in its order denying BOG's motion to dismiss, the two Lanham Act claims require the same elements of proof. See Conn. Cmty. Bank v. Bank of Greenwich, 2007 U.S. Dist. Lexis 32670 at *6 (D. Conn. May 3, 2007) (*Arterton, J.*). Further, a Lanham Act violation is an automatic CUTPA violation. Id. at *11-12 (citing Suisman, Shapiro, Wool, Brennan, Gray, & Greenberg, P.C. v. Suisman, 2006 U.S. Dist. Lexis 8075 (D. Conn. Feb. 15, 2006); Timex Corp. v. Stoller, 961 F. Supp. 374, 381 (D. Conn. 1997); Nabisco Brands, Inc. v. Kaye, 760 F. Supp. 25, 29 (D. Conn. 1991); Dial Corp. v. Manghnani Investment Corp., 659 F. Supp. 1230, 1239 (D. Conn. 1987)). "[T]he law makes clear that to succeed in a Lanham Act suit for trademark infringement, a plaintiff has two obstacles to overcome: the plaintiff must prove that its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark." Gruner + Jahr USA Pub. v. Meredith Corp., 991 F.2d 1072, 1074 (2d Cir. 1993). The court will deal with each of these two elements in turn.

## I. Entitlement to Protection

Marks seeking protection are classified into four categories. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." Bristol-Myers Squibb Co. v.

<u>McNeil-P.P.C., Inc.</u>, 973 F.2d 1033, 1039 (2d Cir. 1992) (quoting <u>Abercrombie & Fitch Co. v. Hunting World</u>, 537 F.2d 4, 9 (2d Cir. 1976)).  CCB concedes that the GBT marks are neither suggestive nor arbitrary or fanciful.  It claims that the marks are descriptive.  "Generic marks are never entitled to protection, while a descriptive mark is eligible for protection if it has become distinctive of the producer's goods in commerce.  This acquired distinctiveness is generally called 'secondary meaning.'"  <u>Id.</u> (internal citations omitted).

BOG argues that the GBT marks are generic and not entitled to protection because they combine the generic term "bank" and the geographic term "Greenwich."  It does not fully develop this argument.  Nevertheless, the argument is misplaced.  The case BOG cites to support this proposition, <u>Bank of Texas v. Commerce Southwest, Inc.</u>, 741 F.2d 785 (5th Cir. 1984), in fact holds that geographic marks are entitled to protection if they acquire secondary meaning, just as a descriptive marks.  <u>Id.</u> at 787.  <u>See also Forschner Group v. Arrow Trading Co.</u>, 30 F.3d 348, 353 (2d Cir. 1994) ("For purposes of trademark status, therefore, a phrase or term that is descriptive of the geographic origin of a product will not receive trademark protection absent proof of secondary meaning.").  The GBT marks are descriptive marks and will be entitled to protection if they have acquired secondary meaning.

### A.  Secondary Meaning

"A descriptive mark is entitled to protection upon proof that it has obtained a secondary meaning, that is to say, an identity that consumers associate with a

single source, even though the source itself may be unknown." <u>Gruner + Jahr</u>, 991 F.2d at 1076 ("upon proof of secondary meaning, a product with a descriptive mark then has become identified - as well as being described - as originating from a single source").  "[I]t is not always the general public's understanding but - depending upon the product - often only a segment of consumers that need be examined. . . .  Moreover, it is only necessary to show that a substantial segment of the relevant group of consumers made the requisite association between the product and the producer."  <u>Centaur Communications, Ltd. v. A/S/M Communications, Inc.</u>, 830 F.2d 1217, 1221-22 (2d Cir. 1987).

The Second Circuit has identified certain elements relevant to a finding of secondary meaning.  "The elements are (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use."  <u>Id.</u> at 1222.  "The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation."  <u>PaperCutter, Inc. v. Fay's Drug Co.</u>, 900 F.2d 558, 564 (2d Cir. 1990).  This burden can be met through either direct or circumstantial evidence.  <u>Id.</u>  CCB must show that the GBT marks acquired secondary meaning before BOG began use of its mark when it opened for business on December 12, 1006.  <u>Id.</u>

### 1.  Advertising Expenditures

While it introduced evidence that it spent money to advertise the GBT

marks, CCB introduced no evidence as to the dollar amount of advertising expenditures to bolster the GBT marks. This obviously does not support its argument that the GBT marks have acquired secondary meaning.

The courts' inquiry does not end there. "The characteristics of the relevant market are important in considering advertising expenditures." <u>Centaur</u>, 830 F.2d at 1222. "Secondary meaning may also be inferred from evidence relating to the nature and extent of the public exposure achieved by the designation, including volume of sales, length of time of use, and advertising and other promotional efforts, with commercial success, rather than the amount of expenditures, being the likely measure." <u>PaperCutter</u>, 900 F.2d 564.

The court takes judicial notice of the fact that Greenwich has a population of roughly 62,000 people. Since opening on February 6, 1998, GBT has expanded from one branch to four branches, not an inconsequential presence for a small community. <u>See</u> Ex. 170 (map of Greenwich showing the four GBT branch locations). Each GBT branch prominently displays the GBT marks on outdoor building signs and window logos, including one branch directly opposite the entrance to the Greenwich train station and one branch opposite a Whole Foods supermarket, both prime, high-traffic locations. James McLean, President and Chief Executive Officer of both CCB and GBT, and William Berkley, founder of both CCB and GBT, both testified that GBT is meant to be a local bank that emphasizes personal contact and service. For instance, McClean sends hand-signed personalized birthday cards to GBT customers. <u>See</u> Exs. 76, 106.

GBT officers testified that its marketing efforts focus on a "shoe leather" campaign. This refers to GBT's philosophy that the most effective marketing tool in a small community is in person contact and solicitation. James Maloney, Assistant Vice President of GBT and branch manager of its Railroad Avenue branch, testified as to the extent of the shoe leather campaign. According to his personally kept activity log, Maloney averages twenty four contacts a week with potential customers, ten in person and fourteen by telephone. Additionally, he attends local networking events such as those sponsored by the Greenwich Chamber of Commerce whenever possible. Maloney estimated he makes five-to-ten contacts at each networking event. GBT also presented evidence that it is active in the community. For instance, it sponsored a visitors' tent at a golf tournament held in Greenwich.

GBT also introduced evidence of small scale advertising and promotional materials without showing the actual cost of those expenditures. For example, GBT produces and distributes promotional pamphlets, pens, mugs, and stationary, all emblazoned with the GBT marks. See, e.g., Exs. 65-82, 92-94.

Although GBT's advertising expenditures are unknown, its effort to promote itself and maintain a presence in the community have bore substantial, measurable fruits in the form of increased commercial success in a relatively closed market, discussed in greater detail below. The lack of evidence to show the amount of advertising expenditures weighs against a finding of secondary meaning, but GBT's active local presence weighs in favor. The court finds this

factor weighs slightly in favor of a finding of secondary meaning.

## 2.  Consumer Studies

Neither party produced any evidence of any consumer studies or survey materials portraying customers' association of the GBT marks with CCB's services.  This factor is inconclusive.  <u>See</u> <u>Simon & Schuster, Inc. v. Dove Audio, Inc.</u>, 970 F. Supp. 279, 294 (S.D.N.Y. 1997).

## 3.  Unsolicited Media Coverage

GBT offered little evidence of unsolicited media coverage.  The evidence of unsolicited media coverage that was introduced at trial was not convincing as there was no evidence of the nature or circulation of the publications.  This factor weighs against a finding of secondary meaning.

## 4.  Sales Success

GBT's deposits have grown steadily since its founding.  Total deposits were $39.24 million in 2000.  That number grew to $113.2 million in 2006.  See Ex. 52.  In that same time period, GBT's share of the Greenwich banking market has grown from 2.25% to 3.95%, in a market dominated by large, national banks, and personal income earned in New York.  As noted above, GBT has expanded from one branch to four branches.  This factor weighs in favor of a finding of secondary meaning.

## 5.  Attempts to Plagiarize

The BOG organizers were aware of GBT's presence and prominence in the Greenwich banking market.  They were also aware that no bank other than GBT

used the word "Greenwich" in its name from 1998 through 2006.  BOG does not deny this.

The court is left with no plausible explanation for BOG choosing a mark strikingly similar to the GBT marks other than that it was trying to capitalize, in some way, on GBT's local success or mimic its marketing strategy.  <u>Centaur</u>, 830 F.2d at 1224.  BOG did not retain trademark counsel for advice or run a trademark search prior to selecting its name, despite its awareness of the GBT marks.  It did retain a marketing consultant, Beth Barhydt of Aberdeen Associates.  Barhydt testified that she conducted research on BOG's behalf regarding the ranking of banks in Greenwich using internet search engines such as Google.  She testified that when she was hired, Google searches for the combination of the words "bank" and "Greenwich," in any order, returned the GBT website as its primary search result.  The court conducted a series of Google searches on the final day of trial, February 19, 2008, of which it takes judicial notice and copies were provided to the parties.  A Google search for the words "bank" and "Greenwich" in that order regardless of the capitalization of the words returns a primary result of the BOG website and a secondary result of the GBT website.  If the sequence of the words are changed, so that "Greenwich" precedes "bank," the search results are also altered: GBT is the primary result and BOG is the secondary result.  The fact that BOG dedicated time, money and effort to ensure its Google ranking was favorable as compared to GBT, but did not consider running a trademark search is telling.

Robert Oca, President, Chief Executive Officer and founder of BOG, testified that he did not foresee any possibility of customer confusion between GBT and BOG when selecting his new banks name. This is not credible testimony and deserves no weight. Oca has been a presence in the local banking community of Fairfield County for nearly two decades. From 1998 until 2002, Oca was President of The Bank of Westport, a direct competitor of CCB's division, Westport National Bank. The two banks opened around the same time and evidence was introduced at trial that there was substantial confusion between the two among local banking customers. Westport and Greenwich are both wealthy, small Connecticut towns that have a comparable population base. It is not believable that a savvy banking executive with a longstanding presence in the local banking community and past experience with a strikingly similar situation that caused confusion in Westport would never even consider the possibility that the similarity between the BOG and GBT marks may cause confusion, and, if he did consider it, reasonably dismiss that possibility. <u>See</u> <u>Simon & Schuster</u>, 970 F. Supp. at 294-95.

This factor weighs in favor of a finding of secondary meaning.

### 6. Length and Exclusivity of Use

GBT was the only bank in Greenwich with the word "Greenwich" in its name from its opening in February 1998 until BOG opened in December 2006. It held exclusive use of its mark continuously for nine years.

As alluded to above, GBT is currently a division of CCB. When GBT first

opened in 1998, it was an independent entity.  On December 1, 2003, GBT merged

with Westport National Bank to form CCB.  GBT remains a division of CCB that

continues to operate locally as GBT, using the GBT marks.

BOG argues, without adequate legal authority in support, that GBT's

merger nullifies the continuity of the GBT marks' use.  There is no requirement in

trademark law that a mark mirror the formal corporate name of the mark's holder.

To borrow from GBT's example, such an interpretation would mean that General

Motors Corporation had long ago forfeited its rights to use the marks "Chevrolet"

and "Chevy."  This is not the case.

This factor weighs heavily in favor of finding secondary meaning.

### 7.  Actual Confusion

The second Circuit has shown that a finding that a mark has acquired

secondary meaning and that the introduction of a second mark creates confusion

between the marks are intrinsically linked.  "The link between secondary meaning

and likelihood of confusion is critical, yet it has often been overlooked by courts.

[The Lanham Act] is meant to protect the public from confusion regarding the

source of goods produced.  If a mark has secondary meaning, a purchaser will

associate it with a certain producer, and will be likely to make that same

association when an identical mark (or a confusingly similar mark), is used on

another producer's product.  In the absence of secondary meaning, however,

there will be no such association in the minds of the purchasing public."

Thompson Medical Co. v. Pfizer, Inc., 753 F.2d 208, 215-16 (2d Cir. 1985).

As shown below, the similarity between the GBT marks and BOG's mark has resulted in actual confusion for current and potential consumers of banking services in Greenwich. This adds some weight to a finding of secondary meaning for the GBT marks.

### 8. Balancing the Secondary Meaning Factors

In weighing the factors relevant to a finding of secondary meaning, no single factor is dispositive and a party need not prove each and every factor. <u>See Centaur</u>, 830 F.2d at 1222. Four of the six relevant factors support CCB's position. GBT's advertising expenditures and sales success, the length and exclusivity of the GBT marks, and BOG's attempt to plagiarize the GBT marks each favor a finding of secondary meaning. Only GBT's lack of unsolicited media coverage weighs against this conclusion. The court finds that the GBT marks have acquired secondary meaning in the Greenwich banking market.

### II. Likelihood of Confusion

"The crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." <u>Savin Corp. v. Savin Group</u>, 391 F.3d 439, 456 (2d Cir. 2004). "To support a finding of infringement, there must be a probability of confusion, not a mere possibility." <u>Playtex Prods. v. Georgia-Pacific Corp.</u>, 390 F.3d 158, 161 (2d Cir. 2004) (internal quotation omitted). Actual confusion need not be proved.

Likelihood of confusion is measured by evaluating the eight factors

enumerated by Judge Friendly in <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492 (2d Cir. 1961).  <u>See</u> <u>Playtex</u>, 390 F.3d at 162.  The eight factors are:  "1) the strength of the plaintiff's mark; 2) the similarity of the parties' marks; 3) the proximity of the parties' products in the marketplace; 4) the likelihood that the plaintiff will 'bridge the gap' between the products; 5) actual consumer confusion between the two marks; 6) the defendant's intent in adopting its mark; 7) the quality of the defendant's product; and 8) the sophistication of the relevant consumer group."  <u>Id.</u>

### A.  Strength of the Mark

"The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis.  There are two components of a mark's strength:  its inherent distinctiveness and the distinctiveness it has acquired in the marketplace."  <u>Brennan's, Inc. v. Brennan's Rest., L.L.C.</u>, 360 F.3d 125, 130-31 (2d Cir. 2004) (internal citation omitted).  Inherent distinctiveness is synonymous with the degree of protection a mark is entitled to based on its classification as generic, descriptive, suggestive, or arbitrary or fanciful.  <u>See</u> <u>Virgin Enters. v. Nawab</u>, 335 F.3d 141, 147-48 (2d Cir. 2003).  CCB concedes that the GBT marks are inherently week.

"[A]cquired distinctiveness, refers to something entirely different.  This measure looks solely to that recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services."  <u>Brennan's</u>, 360 F.3d at 131.  "If a mark has been long, prominently and notoriously used in

commerce, there is a high likelihood that consumers will recognize it from its prior use.  Widespread consumer recognition of a mark previously used in commerce increases the likelihood that consumers will assume it identifies the previously familiar user, and therefore increases the likelihood of consumer confusion if the new user is in fact not related to the first."  <u>Virgin</u>, 335 F.3d at 148.

The Second Circuit has stressed the importance of identifying the relevant market for a mark in determining its acquired distinctiveness.  "[E]ven a common name mark may warrant protection as a strong mark if it has achieved distinctiveness in the marketplace, the second component of a mark's strength.  Yet, to achieve the status of a strong mark, plaintiff must demonstrate distinctiveness in the *relevant* market, for if the mark is not recognized by the relevant consumer group, a similar mark will not deceive those consumers."  <u>Brennan's</u>, 360 F.3d at 132 (emphasis in original).

The relevant market for the GBT marks is comprised of current and potential bank customers in Greenwich.  As explained above, GBT was the only entity in this relatively small municipality operating a bank with the word "Greenwich" in its name for nine consecutive years.  Additionally, GBT has been active in the local community, sponsoring golf events, community events, and maintaining a presence in local groups such as the Greenwich Chamber of Commerce.  While the GBT marks are inherently week, they have acquired some muscle through their continuous, unchallenged use targeted at a finite consumer

group.  This factor weighs slightly in CCB's favor.

### B.  Similarity of the Marks

Court's considering the similarity of the marks focus on two factors: "1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers."  <u>Sports Auth. v. Prime Hospitality Corp.</u>, 89 F.3d 955, 962 (2d Cir. 1996).  "[T]he crux of the issue is whether the similarity is likely to cause confusion among numerous customers who are ordinarily prudent."  <u>Savin</u>, 391 F.3d at 458.  "Because the ultimate issue is the likelihood of confusion, analysis focuses on the particular industry where the marks compete.  This is relevant because likelihood of confusion is related to consumer expectations."  <u>Brennan's</u>, 360 F.3d at 133.

A simple textual analyses of the competing marks in this case shows that they are very similar.  Reading the marks "Greenwich Bank & Trust" and "The Bank of Greenwich" in sequence reveals their inherent similarities.  The operative and identifying words of each mark are the only ones that cath the reader's eye, namely "bank" and "Greenwich."  <u>See</u> <u>Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.</u>, 182 F.3d 133, 140 (2d Cir. 1999) (comparing the two corporate names, "Morningside" is the only term that stands out).  An ordinarily prudent banking customer in Greenwich searching for a local bank would undoubtedly find similarity and confusion in the names of local town banks only readily identified by the words "bank" and "Greenwich."  BOG's argument that the presence of "trust" and "company" (in the long form) in the GBT marks

14

sufficiently distinguishes the banks' marks is unpersuasive. Terms identifying the corporate structure of an entity do not nullify the similarity between two marks when the prominent terms are virtually identical. See Id. (holding "limited" and "L.L.C." have no distinguishing effect on the similarity of the marks). This is particularly so when a large portion of the relevant consumer group is an average personal banking customer that has no formal knowledge of business organizational structures and no incentive to pay particularly close attention when completing run-of-the-mill banking transactions.

This factor weighs heavily in favor of CCB.

### C. Proximity of Products in the Marketplace

"This factor focuses on whether the two products compete with each other. To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." Savin, 391 F.3d at 458. "The competitive proximity factor has two elements, market proximity and geographic proximity. Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products." Brennan's, 360 F.3d at 134.

GBT and BOG are in direct competition in every respect. They provide virtually identical banking services, utilizing a similar marketing strategy to an identical consumer base, within a very small, identical geographic area. BOG does not contest that the banks function in close market and geographic

15

proximity.  This factor weighs heavily in CCB's favor.

### D.  Bridging the Gap

"This factor inquires whether a plaintiff is likely to enter defendant's market, or 'bridge the gap.'  It recognizes the senior user's interest in preserving avenues of expansion and entering into related fields."  Morningside, 182 F.3d at 141.  As the two banks are already in direct competition in a market in which GBT had a strong presence before BOG was formed, there is no gap to bridge, and this factor weighs in favor of CCB.  Id.

### E.  Actual Confusion

"It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion."  Virgin, 335 F.3d at 151.  "There can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion.  Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof."  Savin, 391 F.3d at 459 (quoting World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 489 (5th Cir. 1971)).  "[E]vidence of actual confusion need not be limited to evidence of mistaken completed transactions. . . .  Instead, evidence of actual confusion regarding affiliation or sponsorship is also entirely relevant to the ultimate likelihood-of-confusion inquiry."  Morningside, 182 F.3d at 141.

The bulk of the evidence presented by CCB was aimed at showing instances of actual customer confusion.  CCB presented direct evidence of two

**16**

dozen instances where a potential customer actually confused BOG and GBT. See Exs. 33-41, 46, 48-54, 56-61.[1]  The court need not recount each distinct instance of actual confusion to show that this factor weighs heavily in favor of CCB, and will only highlight certain persuasive instances of confusion.  The court disregarded as inadmissible and/or not credible some of the testimony and exhibits offered, but found some credible.

Maloney, Assistant Vice President of GBT and branch manager of its Railroad Avenue branch, visited the Black Forest Pastry Shop in Greenwich with his merchant services representative on a "cold call" to solicit business.  Upon entering the shop, Maloney identified himself and asked to see the shop's manager.  The manager initially refused to see Maloney, claiming he had already fielded a cold call from Maloney's bank earlier that day.  After some discussion, and the production of Maloney's GBT business card, it was established that the first cold call was conducted by a BOG representative, not by GBT.  Maloney was forced to explain that GBT and BOG were two separate banks and were not

---

[1]BOG filed a motion in limine to preclude introduction of the documentary exhibits showing instances of actual confusion and any supporting testimony. That motion was denied.  See Conn. Cmty. Bank v. Bank of Greenwich, 2008 U.S. Dist. Lexis 9726 (D. Conn. Feb. 11, 2008).  At trial, BOG renewed its objection to the introduction of the documentary exhibits claiming that they were distinguishable from the court's ruling on the motion in limine.  The court overruled the objection.  The court notes that even if the renewed objection to the documentary evidence had been sustained, the outcome would be the same.  The oral testimony of witnesses' personal knowledge of instances of confusion supporting the documentary exhibits was sufficient on its own to justify the court's findings.  Any citations to the documentary exhibits regarding actual confusion in the text of this decision is present only for the convenience of the court, parties, and reader.

affiliated.  <u>See</u> Ex. 61.

Marybeth Hoffman, an administrative assistant at GBT, recounted two instances of individuals looking for BOG employees at GBT.  In the first instance, Hoffman answered a telephone call for Oca, President and Chief Executive Officer of BOG.  Hoffman told the caller he was looking for BOG.  The caller responded: "Isn't this Greenwich Bank."  Hoffman responded that it was GBT, a separate entity from BOG.  <u>See</u> Ex. 46.  The second instance involved a woman visiting GBT in person in search of Janice Stern, who used to work at Bank of New York.  Hoffman asked McLean, who used to work at Bank of New York, if he was acquainted with Stern.  McLean clarified that Stern now worked for BOG.  When Hoffman informed the woman that Stern worked for BOG, she had to clarify that BOG and GBT were separate banks and provide directions to BOG.  <u>See</u> Ex. 48.

Richard Muskus, Senior Vice President Lending for GBT, recounted an instance of confusion at the closing of a commercial lending agreement.  All the documents for the closing had been prepared in advance except for a reconciliation agreement.  Thomas Heagney, a prominent attorney practicing in Greenwich familiar with both Muskus and GBT through nearly ten years of business contact, filled in the entity names on the reconciliation agreement at the closing.  The attorney filled out the agreement on behalf of BOG instead of GBT.  Muskus was forced to correct the error.  The agreement was for $2.25 million.

David Moore, Vice President and branch manager of GBT's Riverside

18

branch, recounted two instances of customer confusion.  The first occurred when Bharat Patel, owner of Tandori Restaurant located across the street from Moore's branch, tried to deposit a check into an account for an entity called "114 E. Putnam Ave LLC" accompanied by a completed deposit slip.  The GBT teller could not find the proper account in GBT's records and called Moore for assistance.  Moore discovered the account was held with BOG and not GBT.  <u>See</u> Ex. 33.  In the second instance, a man attempted to cash a check from a BOG account at Moore's GBT branch.  The GBT teller explained that the banks were not associated.  The man explained that he had stopped at the GBT branch only because he saw the GBT sign on the building and assumed it was the appropriate bank in which to cash his check.  <u>See</u> Ex. 34.  These instances of confusion are best viewed in light of Maloney's testimony that a Citibank branch is located forty feet from GBT's Railroad Avenue branch, but that no customers enter GBT thinking they are in Citibank.

As noted above, GBT presented evidence of multiple other instances of confusion.  These are merely indicative of the consumer confusion caused by the similarity between the GBT and BOG marks.  The fact that actual customers of the banks, potential customers of the banks in the form of local businesses and individuals in the small Greenwich community, and local professionals that do business with the banks were actually confused by the similarity between the marks is telling.  The evidence of actual customer confusion is more than sufficient to support GBT's claim.  <u>See, e.g.</u>, <u>Virgin</u>, 335 F.3d at 151, <u>Morningside</u>,

182 F.3d at 141-42; Sports Authority, 89 F.3d at 963-64. This factor weighs heavily in favor of CCB.

## F. BOG's Good or Bad Faith

"The good-faith factor considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between his and the senior user's product." Savin, 391 F.3d at 460. The court's inquiry here is similar to its consideration of BOG's attempt to plagiarize the GBT marks. Based on the same reasoning as above, the court finds that this factor weighs in GBT's favor because BOG was aware of GBT's presence and reputation in the relevant market and its organizers had experience in the market and with a similar past instance of confusion, but it failed to make any good faith effort to investigate or consider the possibility that confusion may ensue based on the similarity of the banks' marks. See Sports Authority, 89 F.3d at 964-65.

## G. Quality of BOG's Product

The parties introduced no evidence as to the comparative quality of their products or services. This factor is inconclusive.

## H. Sophistication of the Consumer

"Because likelihood of confusion must be assessed by examining the level of sophistication of the relevant purchasers of the plaintiff's and defendant's services, [the court] must consider the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and

giving the attention such purchasers usually give in buying that class of goods."
Id. at 965 (internal quotation omitted). "As the theory goes, the more
sophisticated the purchaser, the less likely he or she will be confused by the
presence of similar marks in the marketplace." Savin, 391 F.3d at 461.

The court takes note of the fact that Greenwich is considered a wealthy
community with a sophisticated population. However, the ordinary purchaser of
banking services giving the attention an average personal banking customer
pays to simple daily transactions is not the highly sophisticated class of people
BOG attempts to portray, regardless of their account balance. A simple review of
the instances of actual confusion noted above proves this point. See Sports
Authority, 89 F.3d at 965 (instances of actual confusion help define sophistication
of customers). Both banks are federally regulated and insured. The average
customer has little incentive to investigate the identity of the bank in which it
closes or opens an account. The average bank customer seeking to merely
deposit a check or make a withdrawal has no incentive to thoroughly investigate
the name of a bank when it appears to be the bank he or she is looking for at first
glance. Similarly, customers have little incentive to investigate the identity of a
from which they seek financing. Not every individual in the relevant population
group is the experienced, savvy attorney who frequently deals with local banks,
although apparently even he gets confused. This factor weighs in CCB's favor.

## I. Balancing the Polaroid Factors

The balancing of the Polaroid factors is not a rigid, mechanical process.

<u>Playtex</u>, 390 F.3d at 162.  Instead of totaling the number of factors that favor each party and comparing the two numbers to see which has more, the court should focus on the ultimate issue of whether customers are likely to be confused.  <u>Id.</u> No one factor is dispositive.  <u>Id.</u>  Indeed, the court need not even consider every factor in reaching it conclusion.  <u>Id.</u> at 167.

Six of the factors relate directly to the likelihood of confusion:  1) the strength of the plaintiff's mark; 2) the similarity of the parties' marks; 3) the proximity of the parties' products in the marketplace; 4) the likelihood that the plaintiff will 'bridge the gap' between the products; 5) actual consumer confusion between the two marks; and 6) the sophistication of the relevant consumer group.  <u>Virgin</u>, 335 F.3d at 146-47.  The two remaining factors, the defendant's intent in adopting its mark and the quality of the defendant's product, are more relevant to other issues in the case such as available remedies.  <u>Id.</u> at 147.

CCB has carried its burden and shown a likelihood of confusion.  Seven of the eight factors weigh in its favor, and the eighth, the quality of BOG's product, is inconclusive because no evidence was submitted by either party.  All six of the factors that bear directly on a likelihood of confusion support CCB's claim.  Three of the factors, the similarity of the marks, proximity of the products and actual confusion, strongly and unquestionably support CCB.  Perhaps the most convincing factor in this case, which also happens to be the most important legally, is the evidence presented to show instances of actual customer confusion.  However, even if the court had sustained BOG's objections to the

22

documentary and testimonial evidence showing instances of actual confusion, the weight of the remaining factors is so heavily in favor of CCB that the court would nonetheless find a likelihood of confusion.

### III.  BOG's Defenses

BOG asserts five affirmative defenses: 1) abandonment of the mark; 2) estoppel; 3) laches; 4) unclean hands; and 5) the suit is brought in bad faith in an attempt to monopolize or restrain trade.  [Doc. #33]  BOG did not include any argument to support its defenses of estoppel, unclean hands or bad faith suit in its pre- or post-trial briefs, and did not submit any evidence to support those defenses at trial.  The court assumes these defenses have been abandoned, but nonetheless finds that they are meritless as they have no factual support on the record.

### A.  Abandonment

"The abandonment doctrine derives from the well-established principle that trademark rights are acquired and maintained through use of a particular mark."  ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 146 (2d Cir. 2007).  "If . . . an owner ceases to use a mark without an intent to resume use in the reasonably foreseeable future, the mark is said to have been 'abandoned.'"  Id.

There is no evidence that CCB abandoned the GBT marks.  Contrarily, all evidence on the record indicates that GBT has continued to operate under its original name and use the GBT marks.  The court assumes that BOG's abandonment defense is premised on its position that GBT's merger into CCB

nullified its right to use the GBT marks.  As discussed above, this is not the case.

BOG has failed to carry its burden to sustain a defense of abandonment.

### B.  Laches

The facts relevant to BOG's laches defense are not in dispute.  The organizers of BOG, led by Oca, filed an application to organize a bank with the Connecticut Department of Banking ("DOB") on February 8, 2005.  <u>See</u> Ex. 500. The DOB held a hearing on the application on May 18, 2005.  <u>See</u> Ex. 524.  CCB received notice of the hearing through certified mail addressed to McLean, return receipt signed by Hoffman, and the DOB weekly bulleting sent to all DOB member organizations including CCB.  <u>See</u> Exs. 524, 589.  No one from CCB attended the hearing or otherwise objected to the application.  On June 30, 2005, the DOB held a second hearing regarding BOG's application to organize.  Again, CCB received prior notice of the hearing through the DOB bulletin.  <u>See</u> Ex. 520.  Again, no one from CCB attended the hearing or otherwise objected.  William Mahone, General Counsel of CCB, testified that McLean called in 2005 to ask if he should attend the DOB hearing, although he could not recall which hearing, and Mahone advised that attendance was not necessary.  He testified that he did not know BOG's proposed name at the time.

On June 30, 2005, the DOB issued BOG a temporary certificate of authority to organize that required BOG to raise $10 million in equity capital before December 30, 2006.  <u>See</u> Ex. 504.  BOG issued an offering circular in support of its fund raising effort on November 15, 2005.  <u>See</u> Ex. 206.  McLean sent the

offering package to Berkley. There is no evidence that CCB or any of its officers had any knowledge of whether BOG's fund raising effort was succeeding. CCB claims it first learned that BOG reached its $10 million target through a newspaper article dated March 27, 2006. On March 30, 2006, Mahone, on behalf of CCB, sent a letter to Oca warning that use of the BOG name would result in confusion with the GBT marks, asked that the name be altered, and threatened legal action. <u>See</u> Ex. 171. BOG concedes that March 30, 2006, is therefore the cutoff date for their laches defense.

CCB offered consistent testimony from several officers to explain its delay in objecting to BOG's chosen name. Its officers, most notably McLean and Berkley, were familiar with Oca's history in the local banking industry. Most relevant to this inquiry was Oca's time spent at The Bank of Westport. Oca testified that he left his position as President of The Bank of Westport to pursue other interest. Julie Turner, who worked at The Bank of Westport under Oca, testified that at the time of Oca's departure he told her directly that the bank's board of directors forced him to leave. When the Bank of Westport encountered financial trouble soon after Oca's departure, CCB's Westport division - albeit prior to the CCB merger, but still controlled by the current CCB officers, notably McLean and Berkley - inspected the bank's books as due diligence for an eventual bid to purchase the bank. The CCB officers found the bank to be in financial trouble from its time under Oca. There was also evidence that Oca attempted to start at least two other banks in southern Connecticut within ten

years of BOG's formation. All his attempts failed. The CCB officers concluded that it was unlikely that Oca's attempt to form BOG would be successful and there was no need to take legal action until he raised the minimum $10 million in equity required by the DOB.

Laches is an equitable defense used instead of a statute of limitations. Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996). The Lanham Act does not include a statute of limitations, so courts look to the most analogous state statute of limitations for the appropriate time period. Id. The most analogous statute of limitations in Connecticut is the three year limitations period for all actions founded upon a tort. See Conn. Gen. Stat. § 52-577. Prior to the running of the statute of limitations, there is a presumption that laches does not apply; after the limitations period has run the presumption lies in favor of the laches defense. Conopco, 95 F.3d at 191.

Assuming that the three year statute of limitations began to run when BOG filed its initial application on February 8, 2005, CCB had until February 7, 2008, to take action. As noted above, the parties agree that Mahone's March 30, 2006, letter to Oca is the cutoff date for the laches defense. This is comfortably within the limitations period. There is a presumption that the laches defense does not apply and BOG must fully carry its factual and legal burden to prove the defense.

"In order to prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action. A defendant has been prejudiced by a delay when the assertion of a

26

claim available some time ago would be inequitable in light of the delay in bringing that claim."  Id. at 192.  "The doctrine of progressive encroachment and the requirement that a plaintiff's delay must be unreasonable both allow the plaintiff some leeway in the timing of his suit.  Although a plaintiff cannot simply sleep on his rights, he has no obligation to sue until the likelihood of confusion looms large and his right to protection has clearly ripened."  Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C., 314 F.3d 62, 68 (2d Cir. 2002).  "Any other rule would require each trademark owner to sue first and ask questions later, and would foster meritless litigation."  Id. at 70.

CCB reasonably believed that Oca would not be successful in raising the $10 million in equity required to open BOG based on its officers' personal knowledge of Oca's limited success in the local banking industry.  They had inspected the books of a bank run by Oca that failed, and knew he had also failed to start other new banks in the area.  It was reasonable for CCB to believe that Oca would have difficulty raising the equity required to open BOG.  Ten million dollars is a substantial sum.  There was a reasonable probability that BOG would never open for business.

To require CCB to begin legal proceedings based on the unlikely probability that Oca and BOG would succeed promotes a "sue first and ask questions later" strategy.  Id.  This would place an unfair burden on CCB as the holder of its mark, and on the court to adjudicate unnecessary disputes.  Additionally, CCB initiated legal action nearly nine months before BOG opened

for business on December 12, 2006.  At the time of Mahone's letter, there was not yet a likelihood of confusion looming large as there was still no direct competition.  This provided BOG with ample opportunity to make any necessary changes to its formation, marketing, and naming strategies.  BOG suffered no prejudice by CCB's delay in beginning legal proceedings.

CCB's delay was reasonable.  Bog suffered no prejudice from the delay.  The laches defense does not apply.

## IV.  Remedies

Injunctive relief is available to CCB under the Lanham Act.  15 U.S.C. § 1116 ("The several courts vested with jurisdiction of civil actions arising under this Act shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 43 [15 U.S.C. § 1125].").[2]  CCB is entitled to such an injunction because the likelihood of confusion posed by the similarity of the GBT marks and the BOG mark constitutes a harm for which there is no adequate remedy at law.  See Suisman, Shapiro, 2006 U.S. Dist. Lexis 8075 at *42-43.

The injunction shall take the following form:  The Bank of Greenwich, and all agents, employees, officers of, or persons working in concert or participation

---

[2]CCB has registered its "The Greenwich Bank & Trust Company" mark with the United States Patent and Trademark office.  See Ex. 2.

with, The Bank of Greenwich, are hereby permanently enjoined from use of the name "The Bank of Greenwich."

BOG is ordered to serve upon CCB within sixty (60) days of the date of this order a report in writing and signed under oath by an officer of BOG with sufficient authority to bind BOG setting forth in detail the manner and form in which BOG undertakes to comply with the court's ordered injunction.

CCB is also entitled to nominal damages in the amount of $1.00. "Nominal damages are recoverable where there is a breach of a legal duty or the invasion of a legal right and no actual damages result or where, as here, such damages are not proven." Wasko v. Manella, 87 Conn. App. 390, 400 n.8 (Conn. App. 2005).

CCB may be entitled to attorneys' fees and costs under CUTPA. Conn. Gen. Stat. § 42-110g(d). The court will consider any motion for attorneys' fees and costs filed by CCB within twenty one (21) days of this order.

### V. Conclusion

CCB proved at trial that the GBT marks acquired secondary meaning in the relevant market and were entitled to protection. It also proved that there was a likelihood of confusion between the GBT marks and the BOG mark. BOG is permanently enjoined from using the mark "The Bank of Greenwich" and is liable for $1.00 in nominal damages.

Judgment shall enter in favor of the plaintiff. The court shall close the case file.

**IT IS SO ORDERED.**

_____/s/_____

**Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: September 5, 2008.**